**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

<table>
<tr><td>FOCUS FINANCIAL PARTNERS, LLC,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>C.A. No. 2020-0188-JTL</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>SCOTT HOLSOPPLE, and HIGHTOWER HOLDINGS, LLC,</td><td>)<br>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
</table>

**OPINION**

Date Submitted: October 7, 2020
Date Decided: October 26, 2020

Travis S. Hunter, Dorronda R. Bordley, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael V. Rella, MURPHY & McGONIGLE, New York, New York; *Attorneys for Plaintiff*.

Daniel M. Silver, Travis J. Ferguson, Alexandra M. Joyce, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Defendants*.

**LASTER, V.C.**

Plaintiff Focus Financial Partners, LLC ("Focus Parent") is the publicly traded parent company of non-party Focus Operating, LLC ("Focus Sub"). Defendant Scott Holsopple previously worked for Focus Sub. Holsopple resigned and took a position with defendant Hightower Holdings, LLC ("Hightower"), a competitor of Focus Sub.

When Holsopple joined Focus Sub, he received a signing bonus consisting largely of incentive units in Focus Parent. To receive the units, Holsopple had to sign an agreement with Focus Parent (a "Unit Agreement"). The Unit Agreement contained restrictive covenants that would appear customarily in an employment agreement, including a non-competition provision, a non-solicitation provision, and a provision restricting the unit holder's ability to share confidential information. The Unit Agreement specified that Delaware law would govern its terms.

Under the terms of his employment, Holsopple received both a base salary and an annual bonus payable in additional incentive units. To receive each grant of units, Holsopple had to sign another Unit Agreement with Focus Parent. During the course of his employment, Holsopple executed a total of five Unit Agreements. Two of the five Unit Agreements selected the courts of this state as the exclusive forum for any disputes arising out of or relating to the Unit Agreements.

By signing the Unit Agreements and receiving units, Holsopple became a member of Focus Parent. The two most recent iterations of Focus Parent's operating agreement selected the courts of this state as the exclusive forum for any disputes arising out of or relating to the operating agreements.

After Holsopple joined Hightower, Focus Parent filed this lawsuit. The currently operative complaint contains six different counts. Focus Parent contends that Holsopple breached the employment-related provisions in the Unit Agreements and violated the exclusive choice-of-forum provisions by filing a lawsuit in California state court. Focus Parent maintains that both Holsopple and Hightower violated the Delaware Uniform Trade Secret Act. And Focus Parent asserts that Hightower tortiously interfered with its contractual rights and business expectations.

Holsopple moved for dismissal from the case on the grounds that this court cannot exercise personal jurisdiction over him. The only potentially viable bases for asserting personal jurisdiction over Holsopple are the Delaware-forum provisions in two of the Unit Agreements and in Focus Parent's two most recent operating agreements. But California has enacted a statute that renders a choice-of-forum provision voidable at the request of the employee if the provision appears in an agreement that the employee signed as a condition of employment.

After a lengthy choice-of-law analysis, this decision concludes that California law would govern the pertinent provisions in the agreements in the absence of the Delaware choice-of-law provisions, that a true conflict exists between Delaware and California law as to the validity of the Delaware choice-of-forum provisions, and that applying Delaware law to validate the Delaware choice-of-forum provisions would offend a fundamental policy of the State of California on a matter where California has a materially greater

2

interest. The Delaware-forum provisions therefore cannot support jurisdiction. Holsopple's

motion is granted, and he is dismissed from the case.[1]

## I.      FACTUAL BACKGROUND

The facts for purposes of Holsopple's motion to dismiss for lack of jurisdiction are

drawn from the currently operative complaint, the documents it incorporates by reference,

and other filings on the docket, including a declaration from Holsopple. At this stage of the

case, the court views the record in the light most favorable to the plaintiff.

### A.      Focus Parent and Focus Sub

Focus Parent is a holding company that owns all of the member interests in Focus

Sub. Focus Parent completed an initial public offering in July 2018, and its units trade on

NASDAQ under the ticker symbol "FOCS."

Focus Parent is organized as a Delaware limited liability company (as is Focus Sub).

During Holsopple's employment, Focus Parent amended its limited liability company

agreement twice, first adopting a version dated July 3, 2017 (the "2017 Operating

Agreement"). and later adopting a version dated July 30, 2018 (the "2018 Operating

Agreement"). For purposes of this case, Focus Parent relies on consent-to-jurisdiction

provisions that appear in the 2017 and 2018 Operating Agreements.

---

[1] Holsopple and Hightower also moved to dismiss the complaint under Rule 12(b)(6) and under the doctrine of *forum non conveniens.* The dismissal of Holsopple on jurisdictional grounds renders his other motions moot. This court will address Hightower's motions in a separate decision.

Through Focus Sub, Focus Parent conducts business in the wealth management industry. As part of its business model, Focus Sub invests in and provides services to investment advisors in the United States, Canada, the United Kingdom, and Australia. Focus Sub has offices in New York and San Francisco.

**B.    Holsopple Joins Focus Sub.**

Holsopple joined Focus Sub as an employee on January 12, 2015. The offer letter that established the terms of his employment was dated December 12, 2014. The letter recited that New York state law would govern its terms. Dkt. 22 Ex. 1.

The offer letter informed Holsopple that he would be "based in [Focus Sub's] San Francisco, CA office." *Id.* The paragraphs of the offer letter that described his compensation stated:

> Annual Salary: You will be paid an annual base salary of $220,000, which will be paid in 24 approximately equal installments twice per month and subject to adjustments for taxes and other withholdings as required by law or the policies of [Focus Sub].
>
> Sign On Bonus: You will receive 40,000 Incentive Units in [Focus Parent], the ultimate parent entity of [Focus Sub]. Your receipt of the Incentive Units and their vesting will be subject to, and conditioned upon, your entry into the standard Incentive Unit Agreement of [Focus Parent]. In addition, you will receive a one-time $75,000 cash upfront bonus.
>
> Bonus Potential: You may be eligible for a discretionary bonus based on performance starting with the fiscal year ending December 31, 2015. The bonus may be paid in cash and/or Incentive Units of [Focus Parent] or a combination of both.

*Id.*

As specified in Holsopple's offer letter, the receipt and vesting of the 40,000 incentive units that comprised part of Holsopple's signing bonus were "subject to, and

conditioned upon" his entry into a "standard Incentive Unit Agreement" with Focus Parent. Holsopple executed the agreement on January 15, 2015. Dkt 49 Ex. 1 (the "2015 Unit Agreement").

The terms of the 2015 Unit Agreement made clear that the incentive units were a form of compensation tied to Holsopple's employment. Consistent with this reality, Holsopple represented in the 2015 Unit Agreement that he was "either an employee, officer, director, agent, consultant or other representative of [Focus Parent] or one of its subsidiaries." *Id.* § 1(c)(ii). The contract conditioned the vesting of his units on his continued employment at Focus Parent or one of its subsidiaries. *Id.* § 3(b). If he stopped working for Focus Parent or one of its subsidiaries, then he would forfeit all unvested units as well as any right to distributions on those units. *Id.* § 3(a). In addition, Focus Parent would gain the right to repurchase his vested units. *Id.* § 3(e).

The 2015 Unit Agreement defined Holsopple as the "Unit Holder." *Id.* § 1. Section 5 of the 2015 Unit Agreement was titled "Restrictive Covenants of Unit Holder." *Id.* § 5. It imposed a series of restrictions on the Unit Holder that typically would appear in an employment agreement.

Section 5(a) imposed the following non-competition obligation:

During the Unit Holder's employment or service period with the Company or its subsidiaries and for one-hundred-eighty (180) days thereafter following any termination of employment or service, the Unit Holder shall not, directly or indirectly, alone or as a partner, officer, director, manager, employee or consultant or equity-holder of any entity: (i) provide any wealth management services, including personal financial planning or personal advisory services of the type provided or contemplated to be provided by the Company or its subsidiaries at the time of such termination to any individual or entity anywhere in the continental United States (a "Competitive Business"); (ii)

5

provide finder, broker or financial advisory services to any Competitive Business; (iii) interfere with any potential acquisition by the Company or its subsidiaries of any other business or discourage any party to any such potential acquisition from engaging in any such transaction; or (iv) provide any services currently provided by the Company to or on behalf of its subsidiaries or affiliates to any business or enterprise that is similar to, or otherwise competitive with, the Company.

Dkt. 49 Ex. 1, § 5(a) (the "Non-Competition Provision").

Section 5(b) imposed the following non-solicitation obligation:

In addition, during the Unit Holder's employment or service period with the Company or its subsidiaries and for twelve (12) months thereafter, the Unit Holder shall not, directly or indirectly, alone or as a partner, officer, director, manager, employee or consultant or equity-holder of any entity . . . solicit or do business with any customer or client of the Company or any of its subsidiaries, or any potential acquisition target of the Company, any potential customer or client of the Company or any of its subsidiaries, or any potential acquisition target of the Company (A) in any matter which interferes with such person's relationship or potential relationship with the Company or its subsidiaries, or any such potential acquisition target of the Company, as the case may be, or (B) in an effort to obtain such persona as a customer, client, supplier, consultant, salesman, agent or representative to any Competitive Business; or . . . work together in any business or enterprise involving wealth management services (other than the Company and its affiliates) with any other current or former senior executives of the Company.

Dkt. 49 Ex. 1, § 5(b) (the "Non-Solicitation Provision"; together with the Non-Competition Provision, the "Restrictive Covenants").

Section 5(c) imposed the following restrictions on the Unit Holder's ability to share "Confidential Information":

The Unit Holder shall not at any time, whether during or after the termination of the Unit Holder's employment or service with [Focus Parent] or its subsidiaries, reveal to any person any Confidential Information (as defined below) except to employees or agents of [Focus Parent] or its subsidiaries who need to know such Confidential Information for the purposes of their employment or activities on behalf of [Focus Parent] or its subsidiaries, or as otherwise authorized by [Focus Parent] in writing. … The Unit Holder shall

6

keep confidential all matters entrusted to the Unit Holder and shall not use or attempt to use any Confidential Information except as may be required in the ordinary course of performing the Unit Holder's duties as an employee, officer, director, agent or other representative of [Focus Parent] or its subsidiaries, nor shall the Unit Holder use any Confidential Information in any manner which injures or causes losses to [Focus Parent].

Dkt. 49 Ex. 1 § 5(c) (the "Confidentiality Provision"). The 2015 Unit Agreement defined

"Confidential Information" broadly to include

any non-public information concerning the organization, business or finances of [Focus Parent] or its subsidiaries, or of any third party for whom [Focus Parent] is under an obligation to keep information confidential that is maintained by [Focus Parent] as confidential. Such Confidential Information shall include trade secrets or confidential information in respect of acquisition models, services, inventions, products, designs, methods, know-how, techniques, systems, processes, engineering data, software programs and software code, works of authorship, customer and supplier lists, customer and supplier information, financial information, pricing information, business plans, projects, plans, notes, memoranda, reports, data, sketches, specifications and proposals.

*Id.* There is no time limit on the Confidentiality Provision; it extends indefinitely.

Implicitly recognizing the obvious connection between these provisions and the Unit Holder's employment, the 2015 Unit Agreement took pains to specify that the agreement did not create any right to remain employed. The pertinent language stated:

[N]o provision contained herein shall entitle the Unit Holder . . . to remain in the employment or service of [Focus Parent] or any of its subsidiaries, if any, or affect the right of [Focus Parent] or any of its subsidiaries to terminate its employment or other relationship with the Unit Holder . . . at any time for any reason . . . . .

*Id.* § 1(c)(i).

The 2015 Unit Agreement contained the following provision selecting Delaware law:

7

THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICTS PROVISION OR RULE (WHETHER OF THE STATE OF DELAWARE, OR ANY OTHER JURISDICTION), THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE TO BE APPLIED. IN FURTHERANCE OF THE FOREGOING, THE INTERNAL LAW OF THE STATE OF DELAWARE WILL CONTROL THE INTERPRETATION AND CONSTRUCTION OF THIS AGREEMENT, EVEN IF UNDER SUCH JURISDICTIONS CHOICE OF LAW OR CONFLICT OF LAW ANALYSIS, THE SUBSTANTIVE LAW OF SOME OTHER JURISDICTION WOULD ORDINARILY APPLY.

*Id.* § 6(e) (the "Delaware-Law Provision"). The 2015 Unit Agreement also contained a jury trial waiver. *Id.* § 6(*l*). The 2015 Unit Agreement did not contain a provision making courts located in Delaware the exclusive forum for disputes arising out of or related to the agreement.

## C.    Holsopple Works For Focus Sub.

When Holsopple joined Focus Sub, he was living in Kansas City, Missouri. Focus Parent asserts, and Holsopple agrees, that he signed the offer letter and 2015 Unit Agreement while there. For three months, Holsopple worked remotely from Kansas City. For two months, he commuted back and forth from Kansas City to San Francisco. In June 2015, Holsopple relocated to San Francisco. For the remainder of his tenure with Focus Sub, Holsopple worked out of the San Francisco office.

During his employment with Focus Sub, Holsopple helped develop Focus Sub's pipeline of investment-firm prospects. He also helped develop Focus Sub's proprietary methods, processes, and strategies for pursuing prospective investment firms. As part of his job, Holsopple participated in discussions with prospective investment firms, and he

8

used Focus Sub's proprietary methods, processes, and strategies when negotiating with potential clients. Compl. ¶¶ 44, 46.

Although Holsopple was based in San Francisco, his work was not limited to California. He regularly traveled across the United States to meet with investment firms. Focus Parent alleges that during the twenty months before his resignation, Holsopple spent approximately 180 days working outside of California. He consequently spent approximately 420 days working in California during the same twenty-month period.

Holsopple has never worked for Focus Sub in Delaware. None of the events giving rise to this matter took place in Delaware.

### D.     The Later Unit Agreements

During his employment, Holsopple signed four additional Unit Agreements.

- An Incentive Unit Agreement dated January 12, 2017. Dkt 49 Ex. 2 (the "2017 Unit Agreement').

- A Long Term Incentive Program Award Agreement dated the November 22, 2017. Dkt 49 Ex. 3 (the "Long-Term Agreement").

- An Incentive Unit Award Agreement dated June 18, 2018. Dkt 49 Ex. 4 (the "2018 Unit Agreement").

- An Omnibus Incentive Unit Award Agreement December 18, 2018. Dkt 49 Ex. 5 (the "Omnibus Agreement").

Holsopple signed these agreements while living in California.

Under the 2017 Unit Agreement, Holsopple received 25,000 incentive units, and he elected to include the value of the grant as income during 2017. Dkt 49 Ex. 2 at 1, 11. The 2017 Unit Agreement was substantively identical to the 2015 Unit Agreement.

9

Under the Long-Term Agreement, Holsopple received 75,000 incentive units, and he elected to include the value of the grant as income during 2017. Dkt 49 Ex. 3 at 1, 12. The Long-Term Agreement was substantively identical to the 2015 Unit Agreement, except that it included the following language making courts located in this state the exclusive form forum for any disputes:

ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENTS OR TRANSACTIONS CONTEMPLATED HEREBY SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF DELAWARE OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE AND THE COMPANY AND THE UNIT HOLDER HEREBY EXPRESSLY SUBMIT TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVE ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT SUCH COURTS ARE AN INCONVENIENT FORUM.

*Id.* § 6(h) (the "Delaware-Forum Provision").

Under the 2018 Unit Agreement, Holsopple received 45,000 incentive units in anticipation of Focus Parent completing an initial public offering, and Holsopple elected to include the value of the grant as income during 2018. Dkt 49 Ex. 4 at 1, 10, 11. The 2018 Unit Agreement was substantively identical to the 2015 Unit Agreement, except that the Non-Competition Provision in the 2018 Unit Agreement extended for a term of one year. *See id.* § 5(a).

Under the Omnibus Agreement, Holsopple received a grant of 50,651 incentive units, which he elected to include the value of the grant as income during 2018. Dkt 49 Ex. 5 at 1, 11, 12. The Omnibus Agreement was substantively identical to the Long-Term

Agreement. It contained both a Delaware-Law Provision and a Delaware-Forum Provision. *See id.* § 6(h).

## E.  The Operating Agreements

When Holsopple joined Focus Parent, its internal affairs were governed by a limited liability company agreement dated as of October 4, 2013. After Holsopple executed the 2015 and 2017 Unit Agreements, but before he entered into the later Unit Agreements, Focus Parent adopted its 2017 Operating Agreement. That agreement contained an integration clause, which stated:

> This Agreement, including all Schedules and Exhibits attached hereto, constitutes the entire agreement of the Members with respect to the subject matter hereof and supersedes all prior agreements with respect to such subject matter, including the Prior Agreements.

Dkt. 49 Ex. 6 § 11.05. The parties have not addressed whether this provision superseded the terms of the 2015 Unit Agreement and the 2017 Unit Agreement, which were prior agreements between Holsopple and Focus Parent.

The 2017 Operating Agreement contained a Delaware-Law Provision. *Id.* § 11.07(a). The 2017 Operating Agreement added a Delaware-Forum Provision, which stated:

> Each party to this Agreement hereby irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or any agreements or transactions contemplated hereby shall be brought exclusively in the courts of the State of Delaware and the United States District Court for the District of Delaware and hereby expressly submits to the personal jurisdiction and venue of such courts for the purposes thereof and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum. Each party hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail,

11

postage prepaid, to the address provided in accordance with Section 11.02, such service to become effective ten (10) days after such mailing.

*Id.* § 11.07(b).

After Holsopple entered into the Long-Term Agreement and the 2018 Unit Agreement, Focus Parent adopted the 2018 Operating Agreement. That agreement contained an integration clause, which stated:

> This Agreement, together with all Exhibits and Schedules hereto and all other agreements referenced therein and herein, constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties and there are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as specifically set forth herein and therein.

Dkt. 49 Ex. 7 § 11.4. The parties have not addressed whether this provision superseded the terms of the Long-Term Agreement and the 2018 Unit Agreement.

The 2018 Operating Agreement contained a Delaware-Law Provision. *Id.* § 11.6. It also contained a Delaware-Forum Provision, which stated:

> Each party to this Agreement hereby irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or any agreements or transactions contemplated hereby shall be brought exclusively in the courts of the State of Delaware and the United States District Court for the District of Delaware and hereby expressly submits to the personal jurisdiction and venue of such courts for the purposes thereof and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum. Each party hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the address provided in accordance with Section 11.9, such service to become effective ten (10) days after such mailing.

*Id.* § 11.7.

12

**F.    Holsopple Leaves Focus Sub.**

On January 6, 2020, Holsopple resigned from Focus Sub. In the months before his resignation, Holsopple downloaded confidential information and trade secrets concerning Focus Sub's prospects. Compl. ¶ 88. He also sent himself a number of emails containing Focus Sub's confidential information. *Id.* ¶ 86.

Around three weeks before he resigned, Holsopple requested and received an overview of the amendments to the management agreements for new business partners that were then in process. *Id.* ¶ 85. Those documents reflected the financial terms that Focus Sub had discussed or agreed to with its new partners and prospective clients. *Id.* On January 6, 2020, the same day that he resigned, Holsopple received detailed spreadsheets reflecting confidential business development efforts and active negotiations with investment firm prospects. *Id.* ¶ 84.

Before returning his electronic devices to Focus Sub, Holsopple allegedly wiped them clean of information. *Id.* ¶¶ 79, 82. Focus Parent alleges that Holsopple's wiping of his devices impeded its ability to recover information from the devices.

**G.    Holsopple Joins Hightower.**

On February 20, 2020, Holsopple joined Hightower. He accepted the position of Chief Growth Officer, a job with responsibilities comparable to his former position with Focus Sub. *Id.* ¶¶ 69, 71. Holsopple continues to live and work in San Francisco.

After learning that Holsopple had joined a competitor, Focus Parent sent a letter to Holsopple reminding him that he remained bound by the Restrictive Covenants and the

13

Confidentiality Provision. Dkt. 49 Ex. 10. Focus Parent sent a similar letter to Hightower. Dkt. 49 Ex. 11. Neither responded.

Since Holsopple joined Hightower, Hightower has invested in two firms that Focus Sub had courted while Holsopple was an employee. Focus Parent believes that Hightower is recruiting a third investment firm that Focus Sub had been pursuing. Compl. ¶¶ 89-90.

## H. Litigation Ensues.

On March 11, 2020, Focus Parent filed this action against Holsopple and Hightower. Five days later, on March 16, 2020, Holsopple and Hightower filed an action against Focus Parent in the Superior Court for the County of San Francisco (respectively, the "California Action" and the "California Court"). Dkt. 52 Ex. B. In the California Action, Holsopple and Hightower sought declarations that the Restrictive Covenants, the Delaware-Law Provisions, and the Delaware-Forum Provisions are invalid and unenforceable under California law.

On March 30, 2020, Focus Parent filed an application in this action for an anti-suit injunction that would have forced Holsopple and Hightower to dismiss the California Action. Dkt. 5. In their opposition, Holsopple and Hightower pointed out that Focus Parent had not asserted a claim in this action that supported that relief. Focus Parent then filed an amended complaint that asserted claims for breach of the Delaware-Forum Provisions. *See* Dkt. 29. At the conclusion of a hearing on April 16, 2020, this court denied the application for an anti-suit injunction. *See* Dkts. 38, 39.

14

In May 2020, Holsopple and Hightower moved to dismiss the amended complaint. In response, Focus Parent filed its second amended complaint, which is the currently operative pleading. Dkt. 49. It contains six causes of action:

- Count I asserts that Holsopple breached Restrictive Covenants, Confidentiality Provisions, and Delaware-Forum Provisions in the Unit Agreements.

- Count II asserts that Holsopple and Hightower misappropriated trade secrets in violation of the Delaware Uniform Trade Secrets Act.

- Count III asserts that Holsopple breached the Delaware-Forum Provisions in the Operating Agreements.

- Count IV seeks injunctive relief against Holsopple and Hightower, which is a remedy rather than a claim.

- Count V contends that Hightower tortiously interfered with the Unit Agreements the Operating Agreements.

- Count VI alleges that both Holsopple and Hightower tortiously interfered with prospective business relations.

After the filing of the currently operative complaint, Holsopple and Hightower renewed their motion to dismiss

Meanwhile, in June 2020, Focus Parent filed counterclaims in the California Action against Holsopple and Hightower. The counterclaims contain seven counts:

- Count I asserts that Holsopple breached Confidentiality Provisions in the Unit Agreements.

- Count II asserts that Holsopple and Hightower misappropriated trade secrets in violation of the California Uniform Trade Secrets Act.

- Count III contends that Hightower tortiously interfered with the Unit Agreements.

- Count IV asserts that Holsopple breached Non-Competition Provisions in the Unit Agreements.

15

- Count V asserts that Holsopple breached Non-Solicitation Provisions in the Unit Agreements.

- Count VI alleges that both Holsopple and Hightower tortiously interfered with Focus Sub's prospective business relations.

- Count VII seeks injunctive relief against Holsopple and Hightower to enforce the Confidentiality Provisions in the Unit Agreements.

Dkt. 52, Ex. J. Notably, Focus Parent does not seek injunctive relief in the California Action based on the Restrictive Covenants, implicitly acknowledging that they are unenforceable under California law. Focus Parent only asserts a claim for injunctive relief based on the Confidentiality Provisions

Holsopple and Hightower moved to dismiss Focus Parent's counterclaims in the California Action. By order dated September 1, 2020, the California Court denied that motion, stating as follows:

> Non-Solicitation/Competition. The FACC's fourth and fifth causes of action are adequately pled. Whether Delaware or California law applies is to be litigated. A Delaware court appears to have deferred to California's courts on the issue.
>
> Interference Torts. The FACC's third cause of action (tortious interference with contract) requires no "independently wrongful" act. (*Korea Supply Co. v. Lockheed Martin* Corp. (2003) 29 Cal. 4th 1134, 1158.) (Defendants do not establish that Holsopple was a Focus employee.) The FACC's sixth cause of action (tortious interference with prospective business relations) adequately pleads independently wrongful acts - e.g., misappropriations of confidential information. (FACC para. 129–135.)
>
> Trade Secrets. The FACC adequately pleads trade secrets misappropriation. (FACC para. 95–105.) Particularization of secrets typically comes after the pleading stage. (CCP 2019.210.) The "economic loss rule" does not apply here. (*Aas v. Sup. Ct.* (2000) 24 Cal.4th 627, 635–36.)
>
> Harm. Focus adequately pled that it was harmed. (FACC para. 83, 87, 114, 121.)

16

"Information and Belief." The few facts in Focus' 149-paragraph FACC pled on "information and belief" are appropriate. (*J.W. v. Watchtower Bible & Tract Society of New York, Inc.* (2018) 29 Cal.App.5th 1142, 1166.)

Preemption. The CUTSA does not preempt claims that, as here, have elements and/or fact different than those for trade secret misappropriation. (*Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 506.).

Dkt. 66 Ex. A (formatting added).

After the California Court's ruling, the parties began conducting discovery in the California Action. Both sides served written discovery requests and provided their objections and responses. Document production is underway. Depositions are scheduled to begin. *See* Dkt. 68 at 5, 6, 32. Discovery in this action has not yet begun.

## II.    LEGAL ANALYSIS

Holsopple has moved for dismissal under Court of Chancery Rule 12(b)(2) because he believes that this court cannot exercise jurisdiction over him. The only grounds on which this court could exercise personal jurisdiction over Holsopple are the Delaware-Forum Provisions. For purposes of the claims asserted in this case, California law govern those provisions, rendering them voidable at Holsopple's request. This court therefore cannot exercise personal jurisdiction over Holsopple, who is dismissed from the case.

## A.    The Standard For Deciding A Rule 12(b)(2) Motion

"Generally, a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over defendant." *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996). However, "[w]hen a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant." *Ryan v. Gifford*,

17

935 A.2d 258, 265 (Del. Ch. 2007). "In ruling on a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record." *Id*. "If . . . no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction and 'the record is construed in the light most favorable to the plaintiff.'" *Id*. (footnote omitted) (quoting *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003)).

Determining "whether a Delaware court has jurisdiction over a nonresident defendant" involves a two-step analysis. *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012). Initially, the court must determine whether a statutory basis exists for the exercise of jurisdiction, such as Delaware's long arm statute. *See id.* (citing 10 *Del. C.* § 3104). "If so, the court must decide whether subjecting the nonresident defendant to jurisdiction would violate due process." *Id*. For the assertion of jurisdiction to pass constitutional muster, "a nonresident defendant must have sufficient 'minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id*. (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

A defendant can consent to a court's exercise of personal jurisdiction. As the Supreme Court of the United States has recognized, "the personal jurisdiction requirement is a waivable right[, and] there are a 'variety of legal arrangements' by which a litigant may

18

give 'express or implied consent to the personal jurisdiction of the court.'"[2] One such arrangement is a forum-selection clause in a contract: "Where the parties to the forum selection clause have consented freely and knowingly to the court's exercise of jurisdiction, the clause is sufficient to confer personal jurisdiction on a court."[3]

---

[2] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (citations omitted); *accord Genuine Parts Co. v. Cepec*, 137 A.3d 123, 130 (Del. 2016); *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013); *see Sternberg v. O'Neil*, 550 A.2d 1105, 1109 n.4 (Del. 1988) ("A party may submit to a given court's jurisdiction by contractual consent."), *abrogated on other grounds* by *Genuine Parts*, 137 A.3d at 123; *see also Ins. Corp. of Ir., Ltd. v. Compagnie de Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."); *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1965) ("[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court . . . ."); *Petrowski v. Hawkeye-Sec. Ins. Co.*, 350 U.S. 495, 495–96 (1956) (holding that stipulation to personal jurisdiction in particular forum is valid waiver of individual right).

[3] *Carlyle*, 67 A.3d at 381; *accord Burger King*, 471 U.S. at 472 n.14 ("Where such forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process." (citation omitted) ); *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1228 (Del. 2018) ("Where a party commits to the jurisdiction of a particular court or forum by contract, such as through a forum selection clause, a 'minimum contacts' analysis is not required as it should clearly anticipate being required to litigate in that forum." (footnote omitted)); *Genuine Parts*, 137 A.3d at 148 ("[A] party to a non-adhesion contract can subject itself to personal jurisdiction via a forum-selection clause."); *see* R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations and Business Organizations* § 13.4[A] (3d ed. 2019) ("Consent to personal jurisdiction is considered a waiver of any objection on due process grounds and an analysis under minimum contacts is unnecessary." (internal quotation marks omitted) ); *see also* Charles Alan Wright et al., *Federal Practice & Procedure* § 1067.3 (4th ed. 2018) ("[P]ersonal jurisdiction can be based on the defendant's consent to have the case adjudicated in the forum, or the defendant's waiver of the personal jurisdiction defense. Conduct that has been held to constitute consent or a constructive waiver often includes . . . entering into an agreement with a forum-selection clause . . . ." (footnotes omitted)).

"Consent to personal jurisdiction is often express, but it can also be implied . . . . [T]he majority rule holds that when parties agree to litigate in a particular forum, they consent implicitly to the existence of personal jurisdiction in that forum." *In re Pilgrim's Pride Corp. Derivative Litig.*, 2019 WL 1224556, at \*11 (Del. Ch. Mar. 15, 2019) (collecting cases).

Focus Parent does not cite any statute that would confer personal jurisdiction over Holsopple. Focus Parent relies exclusively on the Delaware-Forum Provisions. Holsopple's motion rises or falls based on the validity of these provisions.

Holsopple contends that the Delaware-Forum Provisions are invalid under Section 925 of the California Labor Code, which renders both choice-of forum and choice-of-law provisions voidable at the request of an employee when those provisions appear in an agreement that the employee must sign "as a condition of employment." *See* Cal. Lab. C. § 925(a). Enacted on September 25, 2016, and made effective as of January 1, 2017, the statute states:

> (a) An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following:
>
>> (1) Require the employee to adjudicate outside of California a claim arising in California.
>
>> (2) Deprive the employee of the substantive protection of California law with respect to a controversy arising in California.
>
> (b) Any provision of a contract that violates subdivision (a) is voidable by the employee, and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern the dispute.

20

Cal Lab. C. § 925. All of the potentially operative Delaware-Forum Provisions post-date the effectiveness of Section 925.

Focus Parent responds that California law does not apply because of the Delaware-Law Provisions. Focus Parent argues that because the agreements select Delaware law to govern their terms, the Delaware-Forum Provisions are valid. The validity of the Delaware-Forum Provisions thus turns on a choice-of-law determination.[4]

---

[4] Delaware court have confronted with increasing frequency situations in which parties have attempted to use choice-of-law provisions selecting Delaware law to bypass the substantive law of sister states. In this court, the conflicts most often involve agreements containing restrictive covenants. *See*, *e.g.*, *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at \*1, 8–11 (Del. Ch. Mar. 27, 2020) (declining to enforce choice-of-law provisions selecting Delaware law appearing in limited liability agreement of a Delaware entity, unit grant agreement, and employment agreement where Delaware entity operated across the southeastern United States, former employees worked for entity in Tennessee, former employees started competing business in Alabama, and agreements contained restrictive covenants that would be invalid under Alabama law); *NuVasive, Inc. v. Miles (NuVasive II)*, 2019 WL 4010814, at \*7 (Del. Ch. Aug. 26, 2019) (declining to enforce choice-of-law provision selecting Delaware law that would have validated non-solicitation provision in contract that otherwise would be governed by California law); *Cabela's LLC v. Wellman*, 2018 WL 5309954, \*8–10 (Del. Ch. Oct. 16, 2018) (declining to enforce choice-of-law provision in equity award agreement that selected Delaware law where Delaware entity had its headquarters in Nebraska, employees worked in Nebraska, and equity award agreement contained restrictive covenants that would be invalid under Nebraska law); *EBP Lifestyle Brands Hldgs, Inc. v. Boulbain*, 2018 W: 3329363, at \*1–2, 4, 8 n.43 (Del Ch. Aug. 4, 2017) (noting that as a requirement for employee to exercise stock options, Delaware corporation with its principal place of business in California required employee located in California to enter into stockholders' agreement containing choice-of-law provision selecting Delaware law and restrictive covenants that conflicted with California law and which employer agreed were not likely to be enforced under California law; holding that court lacked personal jurisdiction over California resident for purposes of enforcing non-competition provision in stockholders agreement; noting that restrictive covenants in stockholders agreement would likely be invalid notwithstanding choice-of-law provision selecting Delaware law); *Ascension Ins. Hldgs, LLC v. Underwood*, 2015 WL 356002, at \*5 (Del. Ch. Jan. 28, 2015) (holding that California's interest in protecting its employees was materially greater and outweighed Delaware's

21

**B.      The Law That Governs The Long-Term Agreement And The Omnibus Agreement**

Only two of the five Unit Agreements contain Delaware-Forum Provisions: the Long-Term Agreement and the Omnibus Agreement. The analysis of the Unit Agreements therefore focuses on those agreements.

Delaware follows the *Restatement (Second) of Conflict of Laws* when determining what law governs a contract. *Certain Underwriters at Lloyds, Condon v. Chemtura Corp*.,

---

interest even though the restrictive covenants appeared in an agreement that governed the purchase of an equity interest in a Delaware entity); *see also NuVasive, Inc. v. Miles (NuVasive I)*, 2018 WL 4677607, at *2 (Del. Ch. Sept. 28, 2018) (declining to find conflict between California law and Delaware law based on assumption that contract fell within statutory exception to California provision); *Kan–Di–Ki, LLC v. Suer*, 2015 WL 4503210, at *18 (Del. Ch. July 22, 2015) (declining to find conflict between California public policy and non-competition provision where agreement resulted from an asset sale, where California law permits non-competition provisions). This court has also confronted a conflict between agreements selecting Delaware's contractarian regime and the substantive law of a foreign jurisdiction. *See AlixPartners LLC v. Mori*, 2019 WL 6327325, at *1 (Del. Ch. Nov. 26, 2019) (considering issues raised by interplay between and among restrictive covenants in agreement selecting Delaware law, employment regulations established by the European Union, and procedures for employment-related disputes established by Italian law). Other Delaware courts have confronted similar issues in other contexts. *See, e.g.*, *Auto Equity Loans of Delaware, LLC v. Baird*, 2018 WL 2059939, *14 (Del. Ct. Comm. Pleas May 2, 2018) (Pennsylvania policy against usury); *Wind Point Pr's VII-A, L.P. v. Insight Equity A.P. X Co., LLC*, 2020 WL 5054791, at *19–21 (Del. Super. Aug. 17, 2020); *Change Capital P'rs Fund I, LLC. v. Volt Elec. Sys., LLC*, 2018 WL 1635006, *5–9 (Del. Super. Apr. 3, 2018) (protections of Texas Securities Act); (New York and Texas policies against usury). Because Delaware's role as a chartering jurisdiction depends on other states deferring to the application of Delaware law to the internal affairs of entities, the increasing frequency with which parties use Delaware law to create conflicts with the substantive law of other jurisdictions raises significant public policy issues for this state. *See Diedenhofen-Lennartz v. Diedenhofen*, 931 A.2d 439, 451–52 (Del. Ch. 2007) ("If we expect that other sovereigns will respect our state's overriding interest in the interpretation and enforcement of our entity laws, we must show reciprocal respect.").

160 A.3d 457, 464 (Del. 2017). It provides that if the parties to a contract have selected the law of a particular jurisdiction to govern their agreement, then "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied," unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Restatement (Second) of Conflict of Laws* § 187 (1971) [hereinafter *Restatement*].

Here, the Delaware-Law Provisions in the Unit Agreements pass muster under Section 187(a) but fail under Section 187(b). Focus Parent therefore cannot rely on the Delaware-Law Provisions to validate the Delaware-Forum Provisions. Under Section 925, the Delaware-Forum Provisions are voidable at Holsopple's request, and they cannot provide a basis for the exercise of personal jurisdiction.

### 1. Delaware Has A Substantial Relationship To The Parties Or The Transaction.

The first step in the conflict-of-laws analysis is to determine whether the parties selected the law of a state with "no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." *Restatement*, *supra*, § 187(a). The Long-Term Agreement and the Omnibus Agreement select Delaware law, which has a sufficient relationship to the parties to be a viable selection.

A comment to Section 187 explains that "[w]hen the state of the chosen law has some substantial relationship to the parties or the contract," then the parties have a

23

reasonable basis for their choice of law. *Id.* cmt. f. The comment observes that a substantial relationship exists "when [the chosen] state is that where performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business." *Id.* Focus Parent is a Delaware limited liability company, making Delaware its domicile. Under the *Restatement*, that connection provides a reasonable basis for selecting Delaware law. *See id.*

In addition, as a matter of Delaware law, this court's inquiry is constrained by statute. If a contract governing a transaction involving $100,000 or more states that it "shall be governed by or construed under the laws of this State, without regard to principles of conflict of laws," then that provision standing alone "shall conclusively be presumed to be a significant, material and reasonable relationship with this State and shall be enforced whether or not there are other relationships with this State." 6 *Del. C.* § 2708(a). Under Section 2708(a), the Delaware-Law Provisions establish a significant, material, and reasonable relationship with Delaware that supports the selection of Delaware law.

## 2. California Is The Default State For The Long-Term Agreement And The Omnibus Agreement.

The next step in the choice-of-law analysis is to determine "what state's law would apply *but for* the Delaware choice-of law provision." *FP UC*, 2020 WL 1492783, at *9. The parties argue for either Delaware law or California law. As between these jurisdictions, California is the default state, both for the Long-Term Agreement and the Omnibus Agreement as a whole and for the provisions at issue. It is not reasonably conceivable that Delaware could be the default state.

### a. The *Restatement* Principles For Determining The Default State

Absent a binding choice-of-law clause, Section 6 of the *Restatement* contemplates that the law of the jurisdiction with the most significant relationship to the dispute will govern the matter in question. *See Certain Underwriters*, 160 A.3d at 465. A court determines which jurisdiction has the most significant relationship by considering the following factors:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied

*Restatement*, *supra*, § 6(2).

Subsequent sections of the *Restatement* provide guidance on how to apply these factors to particular types of disputes. *See Certain Underwriters*, 160 A.3d at 465. Section 188 addresses contracts. It states

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (*see* § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

25

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the dispute.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied ….

*Restatement*, *supra*, § 188.

The comments to Section 188 explain that a particularly significant factor for contract cases is upholding the justified expectations of the parties. *Id.* cmt. a. Protecting this interest promotes "the values of certainty, predictability and uniformity of result." *Id.* Consequently, the parties' contractual expectations "should not be disappointed by application of the local law rule of a state which would strike down the contract or a provision thereof unless the value of protecting the expectations of the parties is substantially outweighed in the particular case by the interest of the state with the invalidating rule in having this rule applied." *Id.*

The comments to Section 188 also identify situations when the interests of a state could substantially outweigh the justified expectations of the parties. For example,

the state where a party to the contract is domiciled has an obvious interest in the application of its contract rule designed to protect that party against the unfair use of superior bargaining power. And a state where a contract provides that a given business practice is to be pursued has an obvious

26

interest in the application of its rule designed to regulate or to deter that business practice.

*Id.* cmt. a. The comments note that "the state where performance is to occur has an obvious interest in the question whether this performance would be illegal." *Id.* cmt. e. They also note that "[w]hen both parties are to perform in the state, this state will have so close a relationship to the transaction and the parties that it will often be the state of the applicable law even with respect to issues that do not relate strictly to performance." *Id.*

The comments to Section 188 make clear that a court is "not bound to decide all issues under the local law of a single state." *Id.* cmt. d. "Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states." *Id.* It is thus possible that local law could supplant a choice-of-law provision as to one issue, but not as to another.

In addition to the general principles for contract cases, the *Restatement* provides "specific presumptions" for particular types of contracts. *Certain Underwriters*, 160 A.3d at 465. Section 196 addresses contracts for personal services. It states:

> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in section 6 to the transaction and the parties, in which event the local law of the other state will be applied.

*Restatement*, *supra*, § 196. This rule "applies to contracts with servants, independent contractors and agents and with persons exercising a public profession, as lawyers, doctors, brokers, commission agents and factors." *Id.* cmt. a.

27

Of particular significance for this case, the local law of the state where a major portion of the services will be provided governs "the validity of a clause forbidding the employee from entering a business competitive with that of the employer for a stated period after the termination of the employment." *Id.* Section 196 recognizes that the importance of the place of performance "depends somewhat upon the nature of the services involved" and "enjoys greatest significance when the work is to be more or less stationary and is to extend over a considerable period of time." *Id.* cmt. b. The place of performance is less significant "when the employee's duties will require him to travel with fair frequency between two or more states." *Id.* The specific presumption in Section 196 is thus less likely to be helpful if performance takes place in multiple states, such as for an employment agreement "to serve as a traveling salesman in two or more states." *Id.* But even in this situations, "the place where the major portion of the services is to be rendered, provided that there is such a place, is the contact that will be given the greatest weight in determining, with respect to most issues, the state of the applicable law." *Id.*

The specific presumption set forth in Section 196 applies "unless, with respect to the particular issue, some other state has a more significant relationship to the transaction and the parties." *Id.* cmt c. "Whether there is such other state would be determined in light of the choice-of-law principles stated in § 6." *Id.*

### b. The Default State For The Long-Term Agreement And The Omnibus Agreement As A Whole

The principles outlined in the *Restatement* call for considering a number of factors when determining what state's law would govern the Long-Term Agreement and the

Omnibus Agreement in the absence of the Delaware-Law Provision. The different factors create potential connections with different jurisdictions:

- When Holsopple entered into the Long-Term Agreement and the Omnibus Agreement, he was living in California.

- When Holsopple entered into the Long-Term Agreement and the Omnibus Agreement, he was working primarily out of Focus Sub's office in San Francisco, although his work involved travel around the country.

- When Focus Parent entered into the Long-Term Agreement and the Omnibus Agreement, both Focus Parent and Focus Sub had their principal places of business in New York.

- Focus Parent is a Delaware entity.

- One purpose of the Long-Term Agreement and the Omnibus Agreement was to grant Holsopple units reflecting a special class of member interests in a Delaware LLC.

- Holsopple received the grants of units under the Long-Term Agreement and the Omnibus Agreement because he was an employee, and he had to represent that he was an employee to qualify for the units.

- Another purpose of the Long-Term Agreement and the Omnibus Agreement was to impose the Restrictive Covenants on Holsopple.

- Because Holsopple is a California resident, the Restrictive Covenants would have their predominant effect on Holsopple in California.

Based on these factors, three jurisdictions could be the default state: New York, Delaware, or California. No one has argued for New York. The parties only argue for Delaware or California.

When measured against the factors identified in the *Restatement*, the jurisdictional connections weigh decidedly in favor of California. Absent the Delaware-Forum Provisions, California would be the default state the Long-Term Agreement and the

29

Omnibus Agreement. It is not reasonably conceivable that Delaware could be the default state for these agreements.

First, Section 188(a) looks to the place of contracting. Under the *Restatement*, "the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect." *Id.* cmt. e. This factor points to California law, where Holsopple entered into the Long-Term Agreement and the Omnibus Agreement. As the *Restatement* recognizes, however, "[s]tanding alone, the place of contracting is a relatively insignificant contact." *Id.* This factor does not point in the direction of Delaware.

Second, Section 188(b) looks to the place of the negotiations. The *Restatement* describes "[t]he place where the parties negotiate and agree on the terms of their contact" as "a significant contact," but notes that this contact "is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone." *Id.* cmt. e. The pleadings do not suggest that any meaningful negotiations took place. The Long-Term Agreement and the Omnibus Agreement appear to be standard-form agreements that Focus Sub presented on a take-it-or-leave it basis. The allegations of the complaint suggest that the Long-Term Agreement and the Omnibus Agreement would have been presented to Holsopple in California and accepted by him in California. Nothing suggests any connection to Delaware.

Third, Section 188(c) looks to the place of performance. The *Restatement* regards this factor as the most important, explaining that "[t]he state where performance is to

occur" will have "an obvious interest in the nature of the performance in in the party who is to perform." *Id* cmt. e. Under the Delaware LLC Act, units are personal property. 6 *Del C.* § 18–701. Consequently, the place of performance for the granting of units and their subsequent vesting under the Long-Term Agreement and the Omnibus Agreement was California, where Holsopple was domiciled.[5] The place of performance for purposes of the employment-related provisions in the Long-Term Agreement and the Omnibus Agreement was also California, where Holsopple performed the majority of his work.

Fourth, Section 188(d) looks to the location of the subject matter of the contract, where the analysis mirrors the analysis of the place of performance. The subject matter of the provisions governing the granting and vesting of the units was the units themselves. As Holsopple's personal property, they were co-located with him in California. The subject matter of the Restrictive Covenants was Holsopple's employment, which took place primarily in California.

Fifth, Section 188(e), looks to the domicile, residence, state of incorporation, or principal place of business of the parties. The *Restatement* explains that "with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation

---

[5] If Focus Parent were a Delaware corporation and if the units were shares, then the metaphysical situs of the shares would be in Delaware. *See* 8 *Del. C.* § 169. The Delaware LLC Act does not have a similar provision affixing situs. Focus Parent therefore lacks a situs-based argument that Delaware is the place where the granting and vesting of the units took place. To make this observation is not to suggest that a situs-based argument would be persuasive, only that this decision need not consider it.

31

does little, or no, business in the latter state." *Id* cmt. e. Focus Parent was a Delaware LLC with its principal place of business in New York. Holsopple was a resident of California who worked primarily in California. This factor is thus balanced between California and Delaware.

When factors relevant under the *Restatement* are considered as a whole, the point decidedly in favor of California. California is therefore the default state for purposes of the Long-Term Agreement and the Omnibus Agreement.[6]

### c. The Default State For The Provisions At Issue In This Case

The *Restatement* recognizes that a court is "not bound to decide all issues under the local law of a single state." *Restatement*, *supra*, § 188 cmt. d. The substantive provisions at issue in this case are the Non-Competition Provisions, the Non-Solicitation Provisions, and the Confidentiality Provisions (together, the "Employment-Related Provisions"). Focus Parent also claims that Holsopple breached the Delaware-Forum Provisions by filing the California Action, but there would have been no need for the California Action absent

---

[6] The relevant factors are the same for the other Unit Agreements with one exception—the 2015 Unit Agreement. The only differences for that agreement are that Holsopple signed it while living in Missouri, at a time when both Holsopple and Focus Parent expected that Holsopple would relocate to California and work out of Focus Sub's office in San Francisco. Viewed in context as part of the multi-factor analysis, Holsopple's presence in Missouri when he signed the 2015 Unit Agreement does not change the choice-of-law analysis. At most, that factor would point to the law of Missouri applying, and no one argues for that result. California is therefore the default state for all of the Unit Agreements, including the 2015 Unit Agreement.

32

the disputes over the Employment-Related Provisions. It is the Employment-Related Provisions that form the core of the case.

The Employment-Related Provisions are distinct from a separate set of provisions that govern the transfer of units in Focus Parent (the "Unit-Related Provisions"). These provisions establish the initial grant of units, set out the terms on which the units will vest, impose restrictions on the transfer of units, and address related issues.

Fair grounds for debate exist as to whether Delaware or California has a greater interest in the Unit-Related Provisions. Because they are not at issue in this case, this decision need not decide that issue. By contrast, it is not reasonably conceivable that Delaware has a greater interest in the Employment-Related Provisions. California has the greater interest in those aspects of the Unit Agreements.

### i.      The Unit-Related Provisions

Both Delaware and California have an interest in the Unit-Related Provisions. For purposes of this case, this decision need not decide state's interest is paramount.

As a threshold matter, Delaware has a generalized interest in having its law apply to the Unit-Related Provisions because Focus Parent is domiciled in Delaware, meaning that one of the two parties to the contract is a Delaware citizen. That interest, however, is no greater than New York's interest, where Focus Parent is also a citizen, nor is it any greater than California's interest, where Holsopple was and remains a citizen.

More significantly, Delaware has an interest in having its law govern the Unit-Related Provisions because the units are a form of property created under Delaware law. A Delaware LLC is "a separate legal entity" created through Delaware's sovereign power

as a state. *See* 6 *Del. C.* § 18-201(b). When an authorized person files a certificate of formation that complies with the requirements of Delaware law, the acceptance of the filing by the Delaware Secretary of State gives rise to an artificial entity having attributes that only the state can bestow, such as separate legal existence, presumptively perpetual life, and limited liability for its investors. *See id.* (separate legal existence and presumptively perpetual life); 6 *Del. C.* § 18-303(a) (limited liability for investors).

By default, Delaware law governs the terms of the member interests in a Delaware LLC, and Delaware law determines the rights and obligations that they carry, including such "relative rights, powers and duties as the limited liability company may provide." 6 *Del. C.* § 18-302. By default, Delaware law also governs the terms by which a person can admitted as a member in a Delaware LLC. 6 *Del. C.* § 18-301. Delaware law only applies by default, because unlike with a Delaware corporation, a Delaware LLC can select the law of a different jurisdiction to govern its LLC agreement.[7] The ability of parties to select the law of another state to govern the LLC agreement of a Delaware LLC derives from the *primarily* contractarian nature of the LLC itself.[8] Allowing parties to select the law of

---

[7] *See, e.g.*, *In re Bay Hills Emerging P'rs I, L.P.*, 2018 WL 3217650, at *4 (Del. Ch. July 2, 2018) (noting that choice-of-law provision in LLC agreement for Delaware LLC selected Kentucky to govern its terms); *Douzinas v. Am. Bureau of Shipping,, Inc.*, 888 A.2d 1146, 1148 (Del Ch. 2006) (enforcing choice-of-law provision in LLC agreement for Delaware LLC that selected Texas to govern its terms).

[8] Including the adverb "primarily" is important, because it "recognizes the critical but sometimes overlooked on-contractual dimensions of the entity." *Obeid v. Hogan*, 2016 WL 3356851, at *5 n.2 (Del. Ch. June 10, 2016); *see In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch.2008) ("An LLC is primarily a creature of contract . . . . ").

another state recognizes that, in theory, the parties could achieve the same result by including all of the provisions of another state's law in its LLC agreement. Nevertheless,

> [T]he purely contractarian view discounts core attributes of the LLC that only the sovereign can authorize, such as its separate legal existence, potentially perpetual life, and limited liability for its members. See 6 Del. C. §§ 18-201, 18–303. To my mind, when a sovereign makes available an entity with attributes that contracting parties cannot grant themselves by agreement, the entity is not purely contractual. Because the entity has taken advantage of benefits that the sovereign has provided, the sovereign retains an interest in that entity . . . . Put more directly, an LLC agreement is not an exclusively private contract among its members precisely because the LLC has powers that only the State of Delaware can confer. Those powers affect the rights of third parties, who at a minimum must take into account the LLC's separate legal existence and its members' limited liability shield.

*In re Carlisle Etcetera LLC*, 114 A.3d 592, 605–06 (Del. Ch.2015); *see Feeley v. NHAOCG, LLC*, 62 A.3d 649, 659–63 (Del. Ch. 2012); *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 849–56 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del.2012). Professor Manesh has collected a baker's-dozen reasons why LLCs are not wholly contractual and only partially creatures of contract. *See* Mohsen Manesh, *Creatures of Contract: A Half-Truth About LLCs*, 42 Del. J. Corp. L. 391 (2018). Other scholars have also persuasively demonstrated why LLCs are not purely contractual. *See generally* Daniel S. Kleinberger, *Two Decades of "Alternative Entities": From Tax Rationalization Through Alphabet Soup To Contract As Deity*, 14 Fordham J. Corp. & Fin. L. 445, 460–71 (2009) (identifying historical, jurisprudential, and policy reasons why LLCs should not be regarded as purely contractual entities); Sandra K. Miller, *The Best of Both Worlds: Default Fiduciary Duties and Contractual Freedom in Alternative Business Entities*, 39 J. Corp. L. 295, 315–24 (2014) (reviewing empirical studies and presenting data about alternative entity agreements that undermine premises of purely contractarian approach). And whatever one's normative preferences might have been on the matter, "the General Assembly in 2013 adopted an amendment to the LLC Act inconsistent with the purely contractarian view" of LLCs. *Carlisle*, 114 A.3d at 605 (citing H.B. 126, 147th Gen. Assemb. (Del.2013) (amending 6 Del. C. § 18-1104 to provide that "In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern")); see Miller, supra, at 314 (noting that the debate over the purely contractual status of LLCs "was resolved by legislation that was signed into law on June 30, 2013").

as the chartering jurisdiction, Delaware always retains an interest in the entity that it has created, precisely because of the sovereign's role in creating the entity and the concomitant need for the sovereign to oversee its creations. *See Carlisle*, 114 A.3d at 605-06.

Because of its status as the chartering jurisdiction, Delaware has a significant interest in having its law govern the Unit-Related Provisions. That said, the Delaware LLC Act makes clear that Delaware's interest is not inherently paramount, precisely because parties can select the law of another state to govern an LLC agreement. The Unit-Related Provisions also do not implicate the internal affairs doctrine. As noted, an interest in a Delaware LLC is personal property. 6 *Del C.* § 18-701. The law of another jurisdiction can readily govern the transfer of personal property.

At the same time, California has a significant interest in the Unit-Related Provisions. For California, that interest flows from the status of the units as a method of compensating an employee who lived and predominantly worked in California. The terms of the Unit-Related Provisions make clear that they are a form of compensation linked to Holsopple's employment. In each of the Unit Agreements, Holsopple had to represent that he was an employee in order to be entitled to receive the units. See Dkt 49 Exs. 1–5 § 1(c)(ii). Under the Unit-Related Provisions, units would vest annually in equal increments over a period of four years, *as long as Holsopple remained an employee of Focus Parent or one of its subsidiaries*. *Id.* § 3(b). If Holsopple's employment was terminated, then he would forfeit all unvested units and the right to receive distributions on those units. *Id.* § 3(a). The Unit-Related Provisions also gave Focus Parent the right to repurchase the units if the Holsopple's employment with Focus Parent or any of its subsidiaries was terminated. *Id.* §

36

3(e). More broadly, the incentive units generally did not have "any voting or other consent or approval rights under the Operating Agreement." *Id.* § 4(b). The Unit Agreements also contemplated that if a conflict were to arise between provisions in the Unit Agreements and provisions in Holsopple's employment agreement, then the employment agreement would control. *Id.* § 6(b).

Given California's interest in the methods by which California employees and residents are compensated, it poses an interesting question whether Delaware or California has a greater interest in the Unit-Related Provisions. Fortunately, this court need not attempt to balance those competing interests, because the Unit-Related Provisions are not at issue in this case.

### ii.     The Employment-Related Provisions

This case concerns the Employment-Related Provisions. Although both Delaware and California have an interest in the Employment-Related Provisions, Delaware's interest is generalized and weak. California's interest is strong and paramount.

For the Employment-Related Provisions, Delaware's only interest is "a general interest" in promoting freedom of contact. *Ascension*, 2015 WL 356002, at *5. The only factor that connects Delaware with Employment-Related Provisions is that one of the parties is a Delaware LLC.

The state of formation is a weak contact under the *Restatement* test. *See Restatement*, *supra*, § 188 cmt. e. The exception that proves the rule is when the dispute concerns the internal affairs of the entity. Then, the interests of the state of incorporation

37

become paramount.[9] But the internal affairs doctrine does not extend to a Delaware entity's relationships with its employees. As the Delaware Supreme Court recently explained, "a corporation's relationships with its employees" fall outside of the internal affairs doctrine. *Salzburg*, 227 A.3d at 134 (internal quotations omitted). The same is true for a Delaware LLC. Focus Parent's status as a Delaware LLC therefore does not give Delaware a significant interest in the Employment-Related Provisions.

Delaware also does not derive a significant interest in the Employment-Related Provisions from the status of the units as a form of personal property created under the auspices of Delaware law. The Employment-Related Provisions are linked to Holsopple's status as an *employee*, not his status as a *unit holder*. The Non-Competition Provision is specifically tied to Holsopple's employment: It applies "[d]uring the Unit Holder's employment or service period with the Company or its subsidiaries and for one-hundred-eighty (180) days thereafter." Dkt. 49 Exs. 1–5, § 5(a). So too with the Non-Solicitation Provision: It applies "during the Unit Holder's employment or service period with the

---

[9] *See Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.") (citing *Restatement*, *supra*, § 302 cmt. b.); *Salzberg v. Sciabacucchi*, 227 A.3d 102, 121 (Del. 2020) (discussing Delaware's overriding interest in the administration of its law governing internal affairs); *VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005) ("The internal affairs doctrine applies to those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders.").

Company or its subsidiaries and for twelve (12) months thereafter." *Id.* § 5(b). The Confidentiality Provision is unlimited in duration, but it specifically references Holsopple's employment, noting that it applies "whether during or after the termination of the Unit Holder's employment or service with [Focus Parent] or its subsidiaries." *Id.* § 5(c).

More generally, each of the Employment-Related Provisions seeks to constrain Holsopple's ability to take advantage of relationships and knowledge that he developed in his capacity as an employee. The Confidentiality Provision restricts Holsopple's ability to use Confidential Information that Holsopple necessarily acquired in his capacity as an employee. It forbids him from using Confidential Information "except as may be required in the ordinary course of performing [his] duties as an employee," and it only authorizes him to share Confidential Information the information with "employees or agents of [Focus Parent] or its subsidiaries who need to know such Confidential Information for the purposes of their employment or activities on behalf of [Focus Parent] or its subsidiaries, or as otherwise authorized by [Focus Parent] in writing." Dkt. 49 Ex. 1 § 5(c).

Although perhaps not as obvious as the Confidentiality Provision, the Restrictive Covenants have a similar purpose. The Non-Solicitation Provision restricts Holsopple's ability to use relationships and knowledge gained as an employee to solicit Focus Sub's employees and customers. The Non-Competition Provision restricts Holsopple's ability to use relationships and knowledge that Holsopple gained as an employee to compete with Focus Sub.

None of these provisions make sense as restrictions on Holsopple in his capacity as a holder of units. In each of the Unit Agreements, Holsopple agreed that "the Company

39

shall have no duty or obligation to disclose to the Unit Holder, and the Unit Holder shall have no right to be advised of, any material information regarding [Focus Parent] and its subsidiaries, if any, at any time . . . ." Dkt. 49 Exs. 1–5 § 2(c)(ii). He also acknowledged and agreed that the units generally did not have "any voting or other consent or approval rights." *Id.* § 4(b). Focus Parent is a manager-managed LLC in which holders of units have minimal rights *See* Dkt. 49 Ex. 7 §§ 3.1, 6.1. It is not reasonably conceivable that the Employment-Related Provisions pertain in any way to Holsopple's status as a holder of units, as opposed to his status as an employee.

California is therefore the default state for the Employment-Related Provisions. It is not reasonably conceivable that Delaware could be the default state for purposes of these obligations.

### d. Holsopple's Travel

In an effort to avoid the conclusion that California is the default state, Focus Parent tries to dilute Holsopple's connection to California by arguing that he traveled frequently. Focus Parent maintains that California therefore lacks a sufficient interest in Holsopple's employment for its law to apply. As a fallback, Focus Parent contends that the choice-of-law analysis must await discovery into the full extent of Holsopple's travel schedule, the nature of his duties, and the states where he performed services. Focus Parent maintains that similarly extensive discovery is necessary to understand the nature and scope of Holsopple's work for Hightower, including the amount of travel that is involved.

Section 196 of the *Restatement*, which governs contracts for personal services, provides that the "place where the major portion of the services would be rendered" is

presumptively the default state. *Restatement, supra*, § 196; *accord id.* § 196 cmt. b (looking to where the parties contemplated that a "majority of the work" would occur). Consistent with this rule, an employee can avail himself of the protections of California employment law as long as the employee works at least half of the time in California. *See Bromlow v. D & M Carriers*, LLC, 2020 WL 701979, at *5 (N.D. Cal. Feb. 11, 2020) (holding that if an employee spends half of their employment in California, then they may avail themselves of California law) (collecting cases).

It is undisputed that Holsopple travelled for work. It is also undisputed that after relocating to California, Holsopple was a California resident who spent more than half the year working in California. Focus Parent alleges in the complaint that Holsopple traveled 180 days during the twenty months preceding his departure. *See id.* There are approximately 600 days in a twenty-month period. The allegation that Holsopple traveled for 180 days thus supports an inference that remained in California for 420 days. In other words, he was in California 70% of the time. *See* Compl. ¶ 42.

It is reasonable to infer based on Focus Parent's allegations that Focus Parent could not find a period when Holsopple spent more time outside of California. Focus Parent and Focus Sub have all of Holsopple's travel records and expense reports, which is how Focus Parent could make this allegation in the first place. If Focus Parent could allege that Holsopple traveled more extensively, then it would have done so.

Equally important, the choice-of-law determination in this case involves Section 925. The obvious purposes of Section 925 are to (i) protect the ability of California employees to litigate claims that arise by default under California law in a California courts

41

and (ii) prevent California employees from having to litigate those claims under the law of a different jurisdiction in a non-California court. California decisions have explained that Section 925 "establishes a policy prohibiting employers from requiring California employees from agreeing to litigate in a different forum . . . ." *Ryze Claim Sols. LLC v. Super. Ct.*, 245 Cal. Rptr. 3d 575, 579 (App. Ct. 2019); *see also Bromlow,* 438 F. Supp. 3d at 1029 ("California[] [has as] strong public policy against forum-selection clauses in employment agreements") (collecting cases). The legislative history underlying the statute confirms the California legislature's belief that "an employee should not have to take on the burden of litigating in another state when he does not have to do so." S. Rep. No. 1241 at 7 (Cal. Aug. 31, 2015). Consistent with the California precedents, this court has interpreted Section 925 as prohibiting "employers from requiring employees to agree to choice of law and choice of forum provisions that would deprive them of the substantive protection of California law or that would require them to adjudicate their claims outside of California." *NuVasive I*, 2018 WL 4677607, at *4.

To fulfill these public policy goals, courts must determine the effect of Section 925 as early in the case as possible, preferably at the pleading stage. If a covered employee had to engage in protracted proceedings in another jurisdiction, including extensive discovery, before the court could decide whether Section 925 applied, then those proceedings would undermine the purpose of the statute. The employee would have to suffer the burden of litigating in another state just to determine whether the employee could avoid the burden of litigating in another state.

42

Addressing Section 925 at the pleading stage comports with how this court approaches jurisdictional issues in other contexts. As a general rule, "[t]he Court of Chancery is required to rule expressly on the jurisdictional motion before it may consider other grounds for dismissal, such as a failure to state a claim." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.02 at 3–5 (2019). To that end, this court ordinarily evaluates the effectiveness of a choice-of-forum provision, including the specialized type that chooses arbitration, though a pleading-stage motion to dismiss.[10]

In arguing that any choice-of-law determination must await discovery and be the subject of future proceedings, Focus Parent cites a ruling that the California Court made when denying a motion to dismiss Focus Parent's counterclaims in the California Action. In its order, the California Court stated: "Non-Solicitation and Non-competition. The [complaint's] fourth and fifth causes of action are adequately pled. Whether Delaware or California law applies is to be litigated." Dkt. 66 Ex. A. The California Court's ruling does not address Section 925. The California Court made its comment about the Restrictive Covenants. It did express any view on the Delaware-Forum Provisions or the Delaware-Law Provisions.

---

[10] *See, e.g.*, *Solomon v. Pathe Comm'cns Corp.*, 673 A.2d 35, 40 (Del. 1996) (enforcing a forum selection provision on a motion to dismiss); *Bonanno v. VTB Hldgs., Inc.*, 2016 WL 614412, at *5 (Del. Ch. Feb. 8, 2016) ("The proper procedural rubric for addressing a motion to dismiss based on a forum selection clause is found under Rule 12(b)(3), improper venue."). *See generally* Wolfe & Pittenger, *supra*, § 8.02(c) at 8–10.

Because the nature and extent of the Holsopple's travel is essentially undisputed, it is not necessary to defer the choice of law determination until Focus Parent can conduct discovery. Because the choice-of-law determination involves Section 925, it is important to make the choice-of-law determination as early in the case as possible. In this case, the balancing of the *Restatement* factors is clear. Based on the allegations of the complaint, it is not reasonably conceivable that a state other than California could be the default state. It certainly is not reasonably conceivable that Delaware could be the default state.

### 3. A True Conflict Exists Between Delaware And California Law

The next step in the choice-of-law analysis is to determine "if there is an actual conflict between the laws of the different states that each party urges should apply." *Certain Underwriters*, 160 A.3d at 464. To answer this question, a court compares the laws of the competing jurisdictions to determine whether they actually conflict on a relevant point.[11] If the laws are identical, then the conflict is a false one, and the court can apply the law the parties have selected.[12]

---

[11] *See, e.g.*, *Deuley v. DynCorp Int'l, Inc.,* 8 A.3d 1156, 1162–65 (Del. 2010) (comparing laws of Delaware and Dubai); *Silverberg v. Padda*, 2019 WL 4566909, at *12 (Del. Ch. Sept. 19, 2019) (comparing pleading requirements of three jurisdictions);

[12] *See Deuley*, 8 A.3d at 1161 (explain that if the substantive law of the two jurisdictions is the same, then "there is a 'false conflict,' and the court should avoid the choice of law analysis altogether") (internal quotation marks omitted) (footnote omitted); *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 772–73 (Del .Ch. 2014) (same); *Lagrone v. Am. Mortell Corp.*, 2008 WL 4152677, at *5 (Del. Super. Ct. Sept. 4, 2008) ("In such instances of 'false conflicts' of laws, the Court may resolve the dispute without a choice between the laws of the competing jurisdictions."); *see also Restatement*, *supra*, § 186 cmt. c (explaining that if two jurisdictions have "identical local law rules on the

A true conflict exists between California law and Delaware law over the effectiveness of choice-of-forum and choice-of-law provisions in an agreement that an employer requires as a condition of employment. Section 925 of the California Labor Code prohibits an employer from including those provisions in a covered agreement and renders those provisions voidable at the request of an employee. Cal Lab. C. § 925. By contrast, Delaware law generally enforces choice-of-forum and choice-of-law provisions. *See, e.g., Nat'l Indus. Gp. v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013); *J.S. Alberici Const. Co. v. Mid–West Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000).

A true conflict would not exist if Section 925 did not apply. To avoid the application of Section 925, Focus Parent advances a barrage of arguments.

### a. The Argument That Holsopple Might Have Been Represented By Counsel

To avoid the pleading-stage application of Section 925, Focus Parent speculates that Holsopple might have been represented by counsel when negotiating the Long-term Agreement and the Omnibus Agreement. Section 925(e) provides that "[t]his section shall not apply to a contract with an employee who is in fact individually represented by legal counsel in negotiating the terms of an agreement to designate either the venue or forum" in which a controversy arising from the "employment contract may be adjudicated or the choice of law to be applied." Cal Lab. C. § 925(e). Focus Parent suggests that because

issue," then there is no conflict and "the case will be treated for choice-of-law purposes as if these contacts were grouped in a single state").

Holsopple was a relatively senior executive who made a decent living, the court should infer that he may have consulted with counsel.

In the first decision to consider whether Section 925 operated to invalidate Delaware choice-of-law and choice-of-forum provisions in an employment agreement, this court assumed for purposes of the employee's motion for partial summary judgment that the employee had been represented by counsel when negotiating the agreement. *NuVasive I*, 2018 WL 4677607, at \*2. The court made this assumption because the employee had moved for summary judgment, and so the non-movant defendant was entitled to have all factual inferences drawn in its favor. Having made this assumption, the court concluded for purposes of the motion that the employment agreement fell within the exception in Section 925(e). As a result, Delaware law and California law did not conflict, and this court denied the employee's request for an order that would have invalidated the Delaware choice-of-law and choice-of-forum provisions. *Id.* at \*7. Later in the case, after discovery established that the employee had not been represented by counsel, the court revisited this ruling and held that the Delaware choice-of-law provision was unenforceable under Section 925. *See NuVasive II*, 2019 WL 4010814, at \*3.

Here, Focus Parent contends that Section 925(e) might apply, but unlike in *NuVasive I*, the burden is on Focus Parent to provide a basis for this court to assert jurisdiction. *See Ryan,* 935 A.2d at 265. To carry that burden, Focus Parent must establish a *prima facie* case on which jurisdiction could rest. And Holsopple has averred that he did not engage an attorney to assist in him the review, negotiation, or execution of any of the Unit Agreements. Dkt. 52 ¶ 8.

46

On this record, Focus Parent must provide some basis, either in the form of verified allegations or other evidence, that would support an inference that Holsopple was "in fact individually represented by legal counsel in negotiating the terms of an agreement." Cal Lab. C. § 925(e). Focus Parent has not provided any grounds on which this court might infer that Holsopple was individually represented when negotiating the terms of the agreement. Focus Parent simply speculates that perhaps Holsopple might have sent the contract to a lawyer.

At a minimum, Focus Parent should have to point to something that indicates that a lawyer was involved. But even that would not be sufficient to bring this situation within Section 925(e). The statute requires that the lawyer be involved "in negotiating the terms of [the] agreement." In this case, there is no basis to think that Holsopple negotiated anything. All of the Unit Agreements have the look and feel of standardized option agreements that a publicly traded company would use with all of its employees. Focus Sub's offer letter described the 2015 Unit Agreement as a "standard Incentive Unit Agreement of [Focus Parent]." Dkt. 22 Ex. 1. Consistent with this description, the Long-Term Agreement and the Omnibus Agreement appear to be standard-form agreements that Focus Sub presented on a take-it-or-leave it basis. And an exact duplicate of the Long-Term Agreement was at issue in a prior case that involved another Focus Sub employee who received units from Focus Parent. *See* Dkt. 22 Ex. F, *Rockefeller Capital Mgmt., LLC, et al. v. Focus Fin. P'rs*, LLC, Case No. CGC-18-568832, (Cal. Sup. Ct. August 18, 2015). Nothing in the record suggests Holsopple negotiated with Focus Parent, much less that Holsopple employed a lawyer to assist him. Holsopple's declaration says the opposite.

47

Under Focus Parent's approach, an employer like Focus Parent could merely posit that perhaps the employee had sent the agreement to a lawyer, and that would be enough to defeat the application of Section 925 at the pleading stage. Such an approach would vitiate the policy underlying Section 925. Particularly in the face of Holsopple's declaration, Focus Parent cannot rely on the potentially theoretical application of Section 925(e) to claim that California and Delaware law do not conflict.

### b. The Second "Condition Of Employment" Argument

Focus Parent next argues that Section 925 does not apply because signing the Long-term Agreement and the Omnibus Agreement was not a "condition" of Holsopple's employment. As Focus Parent sees it, unless an employee is required to sign the agreement as a condition to being hired, or unless the employee is forced to sign the agreement on pain of termination, then the agreement does not fall within Section 925. Focus Parent notes that it had already hired Holsopple when he signed the Long-Term Agreement and the Omnibus Agreement, and there is no suggestion that Focus Sub threatened him with termination if he did not sign those agreements.

There is virtually no California authority on what it means for an agreement to be a condition of employment. The parties have cited only one California decision, and it rejected Focus Parent's argument. In the *Rockefeller* case, Focus Parent argued that the units awarded under a "November 22, 2017 [unit] agreement" were a bonus that the employee accepted voluntarily. *Rockefeller Capital Mgmt., LLC, et al. v. Focus Fin. P'rs, LLC,* Case No. CGC-18-568832, Order Granting in Substantial Part Plaintiffs' Motion for Preliminary Injunction, at 2 (Cal. Sup. Ct. Oct. 31, 2018). The California court disagreed,

48

holding that the phrase "condition of employment" in Section 925 included "any requirement to receive employment compensation." *Id.* The court then held that the units offered by the "agreement was compensation for the [defendant's] employment." *Id.* The agreement at issue in the *Rockefeller* was the same as the Long-Term Agreement in this case. *See* Dkt. 22 Ex. F, *Rockefeller Capital Mgmt., LLC, et al. v. Focus Fin. P'rs*, LLC, Case No. CGC-18-568832, (Cal. Sup. Ct. August 18, 2015).

The reasoning of *Rockefeller* is sound and fulfills the obvious policy goal of Section 925. To understand why, it is helpful to consider the implications of the Unit Agreements for Holsopple. When Holsopple joined Focus Sub in 2015, his offer letter described his compensation package as consisting of (i) a base salary of $220,000 and (ii) a "Potential Annual Bonus" of between $100,000 and $200,000 that would be "Paid in a Combination of Cash and Focus Incentive Units." *See* Dkt. 22 Ex. 1. To accept any units, he would have to sign a Unit Agreement. Between approximately one-third and one-half of his anticipated annual compensation (excluding benefits) was conditioned on signing a Unit Agreement.

The offer letter also illustrates the potential long-term value that Holsopple would forego by not signing a Unit Agreement. Focus Sub offered Holsopple a "Sign On Bonus" consisting of 40,000 units and $75,000 in cash. *Id.* The offer letter illustrated the potential value of the incentive units after six years, projecting that their value would range from $1,112,151 to $2,143,013. *Id.* At the low end, this amount reflected approximately five times Holsopple's annual salary. Focus Parent conditioned the receipt of this consideration on Holsopple signing a Unit Agreement.

49

Later grants of units presented Holsopple with a similar dilemma. *See* Dkt. 49 Ex. 2 (25,000 units); Dkt. 49 Ex. 3 (75,000 units); Dkt. 49 Ex. 4 (40,000 units); Dkt. 49 Ex. 5 (50,651 units). None of the later grants projected an estimated future value for the units, but it is possible to get a rough sense of the order of magnitude using the projected values contained in the offer letter. On that basis, the total value of the later grants ranged from $5,300,097.89 to $10,213,174.07. Focus Parent conditioned Holsopple's receipt of this consideration on him signing the Unit Agreements.

It thus may have been narrowly true that Holsopple was not forced to sign the Long-term Agreement and the Omnibus Agreement on pain of being fired. Instead, Focus Sub conditioned major portions of Holsopple's compensation on signing those agreements. That is sufficient to bring the agreements within the scope of Section 925.[13]

### c.    The Second "Condition Of Employment" Argument

Focus Parent also tries another version of the not-a-condition-of-employment argument. According to Focus Parent, signing the Long-term Agreement and the Omnibus Agreement could not have been a condition of Holsopple's employment because Focus Sub was Holsopple's employer, yet Focus Parent is the counterparty. Focus Parent maintains that given this structure, entering into the Long-term Agreement and the Omnibus Agreement could not have been a condition of Holsopple's employment.

---

[13] Focus Parent argues that the same reasoning does not apply to the grant of units made in connection with Focus Parent's IPO. That grant was governed by the 2018 Unit Agreement. *See* Dkt 49 ¶ 65; Dkt. 52, Ex. J ¶¶ 47, 58; Dkt. 57 at 9. That agreement does not contain a Delaware-Forum Provision, so it is irrelevant to the jurisdictional analysis.

The plain language of Section 925 does not support this argument. Section 925 states, "An employer shall not require an employee . . . to agree to a provision that would do either of the following . . . ." The statute does not require that the provision appear in a contract between the employer and employee. It encompasses a provision in any agreement that is presented as a condition of employment. A California court has read Section 925 in this fashion when construing one of Focus Parent's agreements. *See Rockefeller Capital Mgmt., LLC, et al. v. Focus Fin. P'rs, LLC,* Case No. CGC-18-568832, Order Granting in Substantial Part Plaintiffs' Motion for Preliminary Injunction, at 2 (Cal. Sup. Ct. Oct. 31, 2018).

This reading fulfills the public policy underlying Section 925 and protects the statute from being easily circumvented. It is trivially easy for an employer to use interests in an affiliate as a compensation vehicle and require that its employees enter into agreements with the affiliate as a condition to receiving the compensation. If an affiliate does not exist, the employer can create an entity for that purpose. Even a simple cash bonus arrangement can be channeled through an affiliate by creating the entity, contributing cash to the affiliate, and then offering employees interests in the entity that would entitle them to receive cash if conditions are met. It is likewise trivially easy for an employer to build choice-of-law provisions, choice-of-forum provisions, and restrictive covenants into the entity's constitutive documents or the agreements governing the interests. Focus Parent's arguments about separate entities, if accepted, would gut Section 925.

Delaware precedent counsels against Focus Parent's separate entities argument. The separate legal existence of entities is important for many purposes, and it is a cornerstone

51

of Delaware law. It is not, however, important in a case that deals with a company's relationship with its employees.

The *Ascension* case illustrates that principle. There, a California resident (Underwood) sold all of the assets of his business to Ascension Holdings LLC, a parent holding company, and Ascension Insurance Services, Inc., its wholly owned operating company. *Ascension*, 2015 WL 356002, at *1. Underwood accepted employment with the operating company and entered into an employment agreement. In both the asset purchase agreement and his employment agreement, Underwood agreed to refrain from competing with the parent company and its subsidiaries for five years. After the deal was completed, Underwood received an "Employee Investment Agreement" that gave him the right to purchase an interest in the parent holding company and which restricted Underwood from competing with the parent company and its subsidiaries for two years after the end of his employment. *Id.* This court refused to enforce the restrictive covenants, holding that (i) California was the default state, (ii) California had the most significant interest in the subject matter of the dispute, and (iii) the restrictive covenants were invalid as a matter of law. *id.* at *5. The fact that the Employee Investment Agreement was a contract between the employee and the parent company rather than between the employee and the subsidiary that employed him did not alter the analysis. The court took it as given that the agreement implicated California employment law, observing that under California law, "a contracting party's right to freely be employed (and to compete thereby with the parties with whom he has contracted) trumps his freedom to contract." *See id.* at *2.

52

To support the opposite conclusion, Focus Parent points to *Down-Lite International, Inc. v. Altbaier*, 2019 WL 3562068 (S.D. Ohio Aug. 6, 2019). The case involved a closely held Ohio corporation with its principal place of business in Ohio. Chad Altbaier, the son of one of the company's three principal owners, worked for the company from his home in California. He signed both an employment agreement containing restrictive covenants and a separate shareholder agreement containing a choice-of-forum provision designating courts in the state of Ohio. *Id.* at *3. After Altbaier started a competing firm, the company filed suit against him in Ohio. Altbaier removed the case to federal court and sought to have it transferred to a federal court in California, maintaining that he had entered into the shareholder agreement as a condition of his employment and that the choice-of-forum provision in the agreement was void under Section 925. *Id.* The magistrate judge declined to transfer the case, holding that the "operative agreement relating to [Altbaier's] employment is the Employment Agreement which did in fact require his signature as a condition of employment." *Id.* at *3. Signing the shareholder agreement, by contrast, was not a condition of his employment; it was a part of the structure of the closely held business. *Id.* The magistrate judge's decision was adopted and affirmed. *See Down-Lite Int'l, Inc. v. Altbaier*, 2020 WL 950426, at *6 (S.D. Ohio Feb. 27, 2020), *aff'd*, 2020 WL 4334888 (6th Cir. July 28, 2020).

There are obvious procedural and factual distinctions between *Down-Lite* and the current case. Procedurally, *Down-Lite* involved a motion to transfer in federal court, which is a discretionary standard. Factually, the shareholder agreement governed a closely held business, and it was easy to draw a fairly bright line between Altbaier's duties and

53

obligations as an employee and his role as a shareholder in a company where his father was one of the three principal owners. Compared to the current case, there were relatively fewer contacts in favor of California (the default state), and far more in favor of Ohio (the selected state)

In this case, the application of Section 925 is not discretionary, but rather a question of jurisdiction. Everything about this case resembles a traditional employment dispute. As discussed, the incentive units were a form of compensation, and Holsopple had to sign the Unit Agreements to receive that compensation. The Employment-Related Provisions are tied explicitly and conceptually to Holsopple's employment. And the choice-of-law factors decidedly favor California over Delaware. Section 925 therefore applies to the Delaware-Forum Provisions and Delaware Choice-of-Law Provisions in the Long-Term Agreement and Omnibus Agreement.

### d. The Not-Arising-In-California Argument

Advancing yet another argument against the application of Section 925, Focus Parent argues that its claims do not arise in California. By its terms, Section 925 only applies to "a claim arising in California." Cal. Lab. C. § 925(a)(1); *see also Felley v. Am. Fujikura Ltd.*, 2018 WL 3861574, at *2 (E.D. Cal. Aug. 14, 2018). According to Focus Parent, California law does not control all of Focus Parent's claims, so Section 925 does not apply.

The question for purpose of Section 925 and the analysis of personal jurisdiction is *not* whether Focus Parent has come up with some theories against Holsopple that might implicate the law of a state other than California. The question is whether Focus Parent's

54

claims under the Long-Term Agreement and the Omnibus Agreement arise under California law. Those are the only claims that could implicate the Delaware-Forum Provisions in those agreements and provide a gateway to support personal jurisdiction over Holsopple in this court. As shown by the choice-of-law analysis, Focus Parent's claims for breach of the Employment-Related Provisions in the Long-Term Agreement and the Omnibus Agreement arise under California law. It is not reasonably conceivable that those claims could arise under Delaware law.

### e.     Section 925 Governs This Case.

Section 925 therefore governs the current case. A true conflict accordingly exists between California law and Delaware law over whether the Delaware-Forum Provisions are valid.

### 4.     California Law Applies.

Once a court has determined that a true conflict exists between the law of the default state and the law that the parties selected, the court must resolve the conflict. *See Total Hldgs. USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873, 881–82 (Del. Ch. 2009). Delaware again follows the *Restatement*, under which the answer turns on whether

> application of the law of the chosen state would be *contrary to a fundamental policy* of a state which has a *materially greater interest* than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Restatement*, *supra*, § 187 (emphasis added).

Whether a policy is "fundamental" involves case-specific analysis. "[N]o detailed statement can be made of the situations where a 'fundamental' policy of the state of the

55

otherwise applicable law will be found to exist." *Id.* § 187 cmt. g. Nevertheless, the *Restatement* cites as an example of a fundamental policy "a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power." *Id.* That is the situation here.

If a rule of law in the default state embodies a fundamental policy of that state, then the court will override a choice-of-law provision that selects the law of a different state if the default state has a materially greater interest in the dispute. The question is *not* simply whether one state favors choice-of-law provisions and another state does not. The court must consider whether applying the choice-of-law provision would displace the default state's law on a substantive issue where the default state has a materially greater interest than the chosen state.[14] When weighing competing interests, a court should "be more inclined to defer to the policy of a state which is closely related to the contract and the parties than to the policy of a state where few contacts are grouped." *Restatement*, *supra*, § 187. If the matter involves a "wide dispersion of contacts among several states," a court should apply the "the state of the applicable law if effect were to be denied the choice-of-law provision." *Id.* In other words, the court should apply the law of the default state.

---

[14] *See Capital Grp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *3 (Del.Ch. Nov. 3, 2004) (discussing that a state's settled public policy constitutes "a materially greater interest" for the purposes of a choice of law analysis); *see also M/S Bremen v. Zapata Offshore Co.*, 407 U.S. 1, 15 (1972) ("A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy . . . whether declared by statute or by judicial decision.").

California law overrides the Delaware-Law Provisions for purposes of determining the validity of the Delaware-Forum Provisions in the Long-Term Agreement and the Omnibus Agreement. California decisions have explained that Section 925 embodies a fundamental policy of the State of California. The statute "establishes a policy prohibiting employers from requiring California employees from agreeing to litigate in a different forum . . ." *Ryze Claim Sols. LLC*, 245 Cal. Rptr. 3d at 579. "California[] [has as] strong public policy against forum-selection clauses in employment agreements [manifested in section 925]." *Bromlow,* 438 F. Supp. at 1029.

This court has recognized that Section 925 embodies a fundamental public policy of the State of California. The statute "broadly conveys the interest of the California legislature in preventing contractual circumvention of its law," which include California's "fundamental public policy against the enforcement of non-compete agreements." *NuVasive I*, 2018 WL 4677607, at *1, *5. Through Section 925, California has manifested a fundamental public policy against "employers from requiring employees to agree to choice of law and choice of forum provisions that would deprive them of the substantive protection of California law or that would require them to adjudicate their claims outside of California." *Id.* at *4. The enactment of Section 925 "strengthens ... California's interest in preventing contractual end-runs around its public policy as expressed in its labor law." *Id.* at *4.

Against this fundamental interest, Delaware has only a generalized interest in promoting freedom of contract. As this court has explained, when a state has a specific

57

public policy interest in regulating a particular substantive area, that policy interest will typically override overrides a generalized interest in promoting freedom of contract.:

> [W]here it is clear that the policy of the default state is that the contract at issue is abhorrent and void, and where, as here, the formation and enforcement of the contract relate overwhelmingly to the default state, a general interest in freedom of contract is unlikely to be the equal of that public policy under the Restatement analysis. The entire purpose of the Restatement analysis is to prevent parties from contracting around the law of the default state by importing the law of a more contractarian state, unless that second state also has a compelling interest in enforcement. In other words, in every instance where the parties seek to circumvent application of the law of the default state, the state whose law was chosen and is asked to enforce the contract will have the interest of protecting freedom to contract. It would be a tautology to suggest that such an interest alone, arising in every case, can trump the public interest of the default state, which, by definition, has the greatest contacts with the contract at issue; otherwise, the Restatement test would be meaningless, and the default state would lose its ability to constrain pernicious enforcement of contract rights.

*Ascension*, 2015 WL 356002, at *5. That analysis applies fully here.

As between Delaware and California, California has a fundamental interest in protecting its employees against choice-of-forum and choice-of-law provisions that compromise the substantive protections of California's labor laws. California has expressed that fundamental interest in a statute. California's specific and fundamental interest in that substantive area of law is materially greater than Delaware's generalized interest in freedom of contract.

### 5. The Delaware-Forum Provisions In The Long-Term Agreement And The Omnibus Agreement Cannot Support Personal Jurisdiction.

California is thus the default state for purposes of the Long-Term Agreement and the Omnibus Agreement. A true conflict exists between California and Delaware law as to the validity of the Delaware-Forum Provisions in those agreements. As between Delaware

and California, California has a fundamental interest that is materially greater than Delaware's. Therefore, California law applies notwithstanding the Delaware-Law Provision.

Section 925 provides that choice-of-forum and choice-of-law provisions in a covered agreement are voidable at the employee's request. Holsopple seeks to invalidate the Delaware-Forum Provisions and Delaware-Law Provisions. He is entitled to that relief. Accordingly, the Delaware Forum Provisions contained in those agreements cannot provide a basis for this court to exercise personal jurisdiction over Holsopple.

## C.      The Delaware-Forum Provisions In The Operating Agreements

Focus Parent separately argues that the Delaware Forum Provisions in the Operating Agreements give this court personal jurisdiction over Holsopple. That argument falls short. The 2017 Operating Agreement cannot provide a basis for exercising personal jurisdiction over Holsopple because the 2018 Operating Agreement superseded it, rendering it a nullity. The 2018 Operating Agreement cannot confer personal jurisdiction over Holsopple for the same reasons that apply to the Long-Term Agreement and the Omnibus Agreement.

### 1.      The 2017 Operating Agreement

The Delaware-Forum Provision in the 2017 Operating Agreement cannot provide a basis for this court to exercise jurisdiction over Holsopple because that agreement has been superseded. Effective July 30, 2018, Focus Parent adopted the 2018 Operating Agreement. By describing the 2018 Operating Agreement as an "[a]mended and [r]estated" agreement, the drafters invoked terms which, by their settled understanding, indicate that the subsequent operating agreement replaced and superseded the predecessor agreement. *Cf.* 6

59

*Del. C.* § 18-208 (restated certificate of formation); 8 *Del. C.* § 245 (restated certificate of incorporation).

The same outcome results from basic principles of contract law. When interpreting a contract, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

Under blackletter law, a binding and completely integrated agreement "discharges prior agreements to the extent that they are within its scope." *Restatement (Second) of Contracts* § 213 (1981). "Where the parties have adopted a writing as a complete and exclusive statement of the terms of the agreement, even consistent additional terms are superseded." *Id.*; *accord id.* § 216 cmt. c ("Where there is a binding completely integrated agreement, even consistent additional terms are superseded if they are within the scope of the agreement.").

Delaware decisions apply these blackletter principles. An integration clause should be interpreted according to its "plain meaning when its terms are unambiguous." *Barton v. Club Ventures Investments LLC*, 2013 WL 6072249, at \*6 (Del. Ch. Nov. 19, 2013). When a "subsequent agreement" contains a valid integration clause, it "supersedes [the] terms]" of any prior agreement covering the same subject matter. *ESG Capital P'rs II, LP v. Passport Special Opportunities Master Fund*, *LP*, 2015 WL 9060982, at \*11 (Del. Ch. Dec. 16, 2015). When a prior agreement and a subsequent agreement cover the same

subject matter and the subsequent agreement contains an integration clause, the prior agreement "need[s] to be memorialized in [the subsequent agreement]" to survive. *Hunt v. Limestone Med. Prop.*, 2018 WL 2939441, at *4 (Del.Ch. June 11, 2018).

Section 11.4 of the 2018 Operating Agreement states that it is an integrated agreement that superseded all prior agreements, including the 2017 Operating Agreement. Dkt. 49 Ex. 7 § 11.4. The 2018 Operating Agreement does not reference the 2017 Operating Agreement anywhere in its text. Dkt. 49 Ex. 7. Focus Parent therefore cannot rely on the 2017 Operating Agreement to state a claim against Holsopple.

### 2. The 2018 Operating Agreement

The Delaware-Forum Provision in the 2018 Operating Agreement also cannot provide a basis for this court to assert personal jurisdiction over Holsopple. The analysis of this issue tracks the analysis of the Delaware-Forum Provisions in the Long-Term Agreement and the Omnibus Agreement.

To invoke the 2018 Operating Agreement, Focus Parent argues that the Unit Agreements fall within the scope of the Delaware-Forum Provision in the 2018 Operating Agreement. That provision requires that "any legal action or proceeding arising out of or relating to [the 2018 Operating Agreement] or an agreements or transactions contemplated hereby" must be litigated in Delaware. Dkt. 49, Ex. 7 § 11.7. To bring this action within the scope of that provision, Focus Parent argues that the Unit Agreements are agreement "contemplated" by the 2018 Operating Agreement. To support this argument, Focus Parent alleges that "[t]he grant of incentive units to Mr. Holsopple is a transaction contemplated

61

by the Operating Agreements because the Operating Agreements expressly contemplated that incentive units will be granted to new members." Compl. ¶ 118.

One problem with this argument is that both the Long-Term Agreement and the Omnibus Agreement contain their own Delaware-Forum Provisions. If Focus Parent understood and expected that the Delaware Forum-Provision in its operating agreement encompassed all aspects of the Long-Term Agreement and the Omnibus Agreement, then Focus Parent would not have needed to include Delaware Forum-Provision in those agreements.

Another problem with this argument is that the Long-Term Agreement pre-dates the 2018 Operating Agreement. The Operating Agreement did not contemplate that agreement in the sense of something that would happen in the future. If Focus Parent wanted an existing agreement to be encompassed within the Delaware-Forum Provision, it should have said so expressly.

Assuming for the sake of analysis that the Delaware-Forum Provision in the 2018 Operating Agreement could encompass Focus Parent's claims under the Long-Term Agreement and the Omnibus Agreement, then the effectiveness of that provision remains subject to Section 925 of the California Labor Code. Holsopple became a party to the 2018 Operating Agreement by virtue of entering into the Long-Term Agreement and the Omnibus Agreement. Those agreements were a condition of his employment: He could not receive a substantial portion of his compensation without signing them. Holsopple therefore became subject to the Delaware-Forum Provision in the 2018 Operating Agreement as a condition of his employment—at least for purposes of any action to enforce

62

the Employment-Related Provisions in the Long-Term Agreement and the Omnibus Agreement.

This decision does not reach the question of whether the Delaware-Forum Provision in the 2018 Operating Agreement would apply to any claim arising under the 2018 Operating Agreement itself. A case of that sort would implicate the internal affairs doctrine and result in a very different choice-of-law analysis. This decision likewise does not address whether the Delaware-Forum Provision in the 2018 Operating Agreement would apply to any claim to enforce the Unit-Related Provisions in the Long-Term Agreement and the Omnibus Agreement. As this decision has discussed, a case of that sort would implicate legal issues where both Delaware and California have interests, potentially producing a different choice-of-law analysis. *See* Part III.B.2.c., *supra*.

This decision holds only that the Delaware-Forum Provision in the 2018 Operating Agreement cannot provide a basis for this court to exercise personal jurisdiction over Holsopple for purposes of claims to enforce the Employment-Related Provisions in the Long-Term Agreement and the Omnibus Agreement. For purposes of those claims, Section 925 overrides the Delaware-Forum Provision, preventing it from providing a basis for personal jurisdiction over Holsopple.

### III. CONCLUSION

The Delaware-Forum Provisions provide the only basis on which this court could exercise personal jurisdiction over Holsopple. But California law, not Delaware law, governs those provisions, and Section 925 of the California Labor Code renders them

63

voidable at Holsopple's request. This court therefore lacks any basis to assert personal jurisdiction over Holsopple, and he is dismissed from this action.